**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL P. THOMPSON, | ) | |
| | ) | CASE NO.    3:10-cv-01688 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Daniel P. Thompson ("Thompson") challenges the final decision of the

Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Thompson's

claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. § 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g)

and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED

and REMANDED for further proceedings consistent with this opinion.

**I.  Procedural History**

On June 22, 2004, Thompson filed an application for SSI alleging a disability onset date

of March 20, 1996, and claiming that he was disabled due to various impairments.[1]  His application was denied both initially and upon reconsideration.  Thompson timely requested an administrative hearing.

On September 21, 2007, an Administrative Law Judge ("ALJ") held a hearing during which Thompson, represented by counsel, testified.  On June 10, 2008, the ALJ found Thompson was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II.  Evidence

### Personal and Vocational Evidence

Age thirty-nine (39) at the time of his administrative hearing, Thompson is a "younger" person under social security regulations.  *See* 20 C.F.R. § 416.963(c). Thompson has a high school equivalent education and no past relevant work.

### Medical Evidence

**Physical Impairment**s

In 1989, Thompson's back was injured by a crane while at work.  (Tr. 462.) Subsequently, he underwent two surgeries -- right hemilaminectomy at L4-L5, one in 1996 and the other in 1998.  *Id*.

---

[1]  Thompson has filed two previous claims for supplemental security income.  The first took place on September 25, 1998.  An ALJ found that he was not disabled and, on November 21, 2001, dismissed his request for a hearing. Thompson filed again on July 12, 2002.  This claim was initially denied on October 21, 2002.  No appeal was taken from either of these decisions. Thus, although Thompson claims an onset date of March 20, 1996, any alleged disability prior to November 21, 2001, has already been adjudicated.  (Tr. 16.)

In 2001, Thompson was seen in both the Toledo Hospital and Flower Hospital emergency rooms ("ER").  (Tr. 313-29.)  He consistently complained of lower back pain.  *Id.*  In 2002, Thompson was seen at Flower Hospital, Toledo Hospital, and Bay Park Community Hospital for complaints of chronic lower back pain.  (Tr. 303-12.)

On July 3 and 11, 2002, Willis Morse, M.D., issued disability certificates indicating that Thompson was "totally incapacitated" between June 25, 2002, and August 11, 2002, due to degenerative disc disease.  (Tr. 183, 181.)

On July 26, 2002, Thompson saw Thomas Andreshak, M.D., and complained that he had been in pain for six weeks since lifting a thirty-five gallon fish tank.  (Tr. 180.)  Dr. Andreshak noted that Thompson had mild tenderness across his lower back, but found that he had normal gait, normal back strength, good motion bilaterally in his hips without pain or instability, and good strength in both feet and legs.  *Id.*  Dr. Andreshak noted that Thompson's MRI showed some early degenerative changes over L4-L5, but otherwise no significant surgical lesion.  *Id.* He diagnosed Thompson with surgical degenerative disc disease at L4-L5.  He recommended anti-inflammatory medication and physical therapy in lieu of surgical treatment.  *Id.*  Thompson insisted on receiving a prescription for narcotics, which Dr. Andreshak refused.  Instead, he asked Thompson to get a second opinion before narcotics were prescribed.  *Id.*  The treatment relationship with Dr. Andreshak ended after Thompson again insisted on a prescription for narcotics.  *Id*.  Dr. Andreshak noted that he "felt he was seeking treatment secondary to gain." *Id.*

On November 4, 2002, Thompson was seen at the Toledo Hospital ER for back pain, claiming it began when he started a new job that required a lot of standing.  (Tr. 306.)  He was given pain relievers and an antihistamine.  *Id.*

3

On December 24, 2002, Thompson was seen at the Toledo Hospital ER for back pain after moving a couch.  (Tr. 303.)  Thompson said his pain had "never been as bad as this."  *Id.* He requested something "stronger" and was given a shot of Nubain.  *Id.*  He walked out of the ER without waiting for discharge instructions or for an x-ray that had been ordered.  *Id.*

In 2003, Thompson was seen at Toledo Hospital, St. Vincent Mercy Medical Center, and Flower Hospital for complaints related to chronic lower back pain.  (Tr. 300-02, 283-86.)

His chief complaint at Flower Hospital on December 13, 2003, was lower back pain radiating to his right leg.  (Tr. 285.)  Though Thompson denied receiving treatment for this back pain, Flower Hospital staff researched surrounding area ERS and found he had been recently seen at various hospitals for back pain and had received multiple prescriptions for narcotics.  (Tr. 286.)  Thompson was given a prescription for Vicodin and warned not to continue his drug seeking behavior.  *Id.*

In 2004, Thompson was seen at St. Vincent Mercy Medical Center and Toledo Hospital for complaints related to chronic back pain.  (Tr. 231, 466-67.)  In addition, on January 10, 2004, Thompson was seen at the Toledo Hospital ER for back pain after falling in the tub.  (Tr. 278.) After being diagnosed with a low back strain, he was given an anti-inflammatory, pain relievers, an antihistamine, and a prescription for Vicodin.  *Id.*

On October 27, 2004, a reviewing state agency physician, Michael Stock, M.D., opined that Thompson could perform light work exertionally.  (Tr. 355-62.)  Dr. Stock found that Thompson could occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand and/or walk for six hours in an eight hour day, and had unlimited push and/or pull capacity.  (Tr. 356.)  He noted Thompson's lone postural restriction as a limitation to only occasional kneeling.

4

(Tr. 357.)  Dr. Stock found no manipulative, visual, communicative, or environmental limitations.  (Tr. 358-59.)  Gary E. DeMuth, M.D., reviewed and agreed with these findings.  (Tr. 362.)

In 2005, Thompson visited St. Charles Mercy Hospital, Flower Hospital, and Toledo Hospital for complaints related to chronic back pain.  (Tr. 405-21, 452-53.)

On January 7, 2005, Thompson was seen at St. Charles Mercy Hospital's Center for Pain Management.  (Tr. 463.)  He demonstrated a decreased range of motion in the lumbar spine, a positive straight leg raise, decreased sensation to pinprick in the left foot, and diminished deep tendon reflexes.  *Id.*  He was treated with pain medications and agreed to try epidural steroid injections.  *Id.*  These treatments continued for several months.  (Tr. 447-51, 674-83.)  On January 19, 2005, an MRI showed post-operative changes at the right-sided laminectomy.  (Tr. 460.)  There was a mass effect on the adjacent thecal sac at L4-L5 that was likely due to the scar, but a residual or recurrent disc could not be excluded.  (Tr. 460-61.)  There were also degenerative changes at L3-L4 and L5-S1.  *Id.*

On March 11, 2005, Thompson was seen at the Toledo Hospital ER for back pain related to lifting.  (Tr. 452.)  When he was told that no narcotics would be prescribed, he became irritated and "walked briskly" out.  (Tr. 453.)

On May 12, 2005, while visiting the Center for Pain Management, Thompson complained of low back pain and decreased sensation to touch over the lateral aspect of his right leg and towards his right great toe.  (Tr. 449.)  Examination revealed equal motor strength in all muscle groups in the lower extremities.  *Id.*  He was continued on medications, including Vicodin, which he related helped.  (Tr. 450.)

On November 18, 2005, Thompson went to the Toledo Hospital ER for back pain he related was due to lifting weights.  (Tr. 414.)

In December 2005, Thompson went to the St. Charles ER complaining of back pain.  (Tr. 405.)  He sought refills for Vicodin and Percocet.  *Id.*  He was told that he would not be given narcotics at that time.  (Tr. 406.)

In 2006, Thompson was seen at St. Charles Mercy Hospital, St. Luke's Hospital, St. Vincent Mercy Medical Center, the Medical University of Ohio, and University Medical Center at the University of Toledo for complaints related to chronic back pain.  (Tr. 490-511, 623-56, 795-811.)  On March 4,  2006, Thompson went to the St. Vincent ER complaining of back pain that started when he moved a stove a week earlier.  (Tr. 659-60.)

On April 20, 2006, Thompson saw Jeffrey Blood, M.D., for back pain and related he had hit his arm on a doorway.  (Tr. 661.)  On April 28, 2006, Dr. Blood completed a Basic Medical form for the Ohio Department of Job and Family Services.  (Tr. 666-67.)  Dr. Blood opined that Thompson could lift eleven to twenty pounds occasionally and eight to ten pounds frequently, but could only be on his feet for two hours a day.  (Tr. 667.)  Dr. Blood also found that Thompson could sit for four hours uninterrupted for a total of eight hours in an eight-hour workday.  *Id.*  Dr. Blood noted that Thompson was extremely limited in his ability to push/pull and bend, and markedly limited on his ability to reach.  *Id.*  However, Dr. Blood found that Thompson was not significantly limited in his ability to perform repetitive foot movements.  *Id.*  Dr. Blood also noted that Thompson had decreased range of motion in the spine with movement causing back pain.  *Id.*  He also had blurred vision and a weak, painful low back.  *Id.*  Dr. Blood opined that Thompson was unemployable and that the limitations were expected to last twelve or

6

more months.  *Id.*

On June 29, 2006, Thompson saw Dr. Blood for a knee injury sustained while playing softball.  (Tr. 726, 664.)

On August 14, 2006, Thompson went to the St. Vincent ER complaining of pain after he slipped and fell while walking home from the store.  (Tr. 638.)

On September 17, 2006, Thompson went to the Medical University of Ohio Department of Radiology complaining that he woke up in the morning with low back pain.  (Tr. 808.)  An x-ray revealed lumbar spondylosis, particularly of L4-L5, with neural foraminal stenosis of L4-L5 and L5-S1.  *Id.*

In 2007, Thompson was seen at St. Charles Mercy Hospital for chronic lower back pain.  (Tr. 827-33.)

On June 26, 2007, Thompson presented at the St. Charles ER complaining of lower back pain that was "more painful than usual."  (Tr. 829.)  Thompson believed the increased pain was related to a fall he had suffered four weeks earlier.  *Id.*

On November 13, 19, and 21, and December 5 and 14 of 2007, as well as January 3, 2008, Thompson was seen at Toledo Pain Services.  (Tr. 850-70.)  Notably, on December 5, 2007, Thompson reported that with medication his symptoms were improving and that his activities of daily living were normal, while his recreational activities remained restricted.  (Tr. 858.)

**Mental Impairments**

On January 30, 2004, Thompson was admitted to the Toledo Hospital for detoxification from IV heroin.  (Tr. 260-76.)  On February 13, 2004, Thompson again presented at the Toledo

7

Hospital requesting detoxification after he relapsed.  (Tr. 251-59.)  On February 27, 2004, Thompson again went through detoxification for heroin dependency.  (Tr. 234-50.)

On October 9, 2004, James F. Sunbury, Ph.D., conducted a psychological evaluation of Thompson upon request of the Bureau of Disability Determination.  (Tr. 351.)  Thompson reported he had been on a methadone treatment program for five months due to an addiction to heroin and other opioids, and a history of marijuana and cocaine abuse.  (Tr. 352.)  Dr. Sunbury noted that Thompson exhibited no signs of intoxication, was cooperative during the interview, and did not appear to exaggerate or minimize his symptoms.  *Id.*  Thompson reported that his typical mood was "crabby" and he was easily irritated.  (Tr. 353.)  Testing suggested that Thompson functioned in the low average intellectual range.  *Id.*  Dr. Sunbury noted that his judgment and insight were poor.  *Id.*  Thompson reported that his wife did the housework and shopping and managed the money.  *Id.*  Dr. Sunbury diagnosed opioid dependence in early full remission, a depressive disorder not otherwise specified, and a personality disorder not otherwise specified with antisocial features.  (Tr. 354.)  Dr. Sunbury concluded that Thompson was mildly limited in his ability to relate to other workers and supervisors; his ability to withstand the stress and pressure associated with day-to-day work was moderately limited due to mental health; and, that his ability to pay attention, understand and follow instructions, and perform simple repetitive tasks was not limited.  *Id.*

On November 29, 2004, following Dr. Sunbury's examination, J. Rod Coffman, Ph.D., a state agency psychologist, reviewed the file and concluded that Thompson was capable of multi-step instructions if clean and sober, and had no severe work limitations as a result of any mental disorder.  (Tr. 365-79.)  He found that Thompson suffered from affective, personality, and

8

substance addiction disorders, but they were not severe.  (Tr. 365.)  He found that Thompson had

no functional limitations on activities of daily living nor did he experience episodes of

decompensation.  (Tr. 375.)  However, he found mild functional limitations in maintaining social

functioning, concentration, persistence, or pace.  *Id.*  Dr. Coffman's opinion was affirmed on

May 28, 2005, by state agency reviewing psychologist Roseann Umana, Ph.D. (Tr. 365.)

On March 4, 2005, Thompson was seen as an outpatient at Unison Behavioral Health by

Marsha Elliot, M.Ed.  (Tr. 401-04.)  Thompson told Ms. Elliot that he had been depressed for

years.  (Tr. 401.)  He also told Ms. Elliot that he had been incarcerated "a lot" due to drug use.

(Tr. 402.)  He stated, however, that he had not used marijuana or heroin in nine months or crack

cocaine in three months.  (Tr. 402.)  Thompson had difficulty focusing his thoughts, but his

thought process was organized and he was alert and oriented.  (Tr. 402.)

On June 17, 2005, Alamdar Kazmi, M.D., at Unison Behavioral Health diagnosed

Thompson with dysthymic disorder, rule out major depressive disorder, recurrent, and

polysubstance dependence.  (Tr. 398-400.)  Thompson told Dr. Kazmi that he was smoking

marijuana daily, but had not used cocaine in over a year.  (Tr. 398.)

From September 13, 2005, through September 18, 2005, Thompson was hospitalized at

the Toledo Hospital for detoxification from cocaine and heroin.  (Tr. 439-46.)

 On October 5, 2005, Thompson was seen as an outpatient at Harbor Behavioral Health

Center by Ayana Perry, a licensed social worker.  (Tr. 392-97.)  He complained of anxiety,

depression, and symptoms of methadone withdrawal.  *Id*.  However, he alleged that he had been

sober for two and a half weeks.  *Id*.

On October 13, 2005, Thompson was seen by Syed Hashimi, M.D., for a psychiatric

9

evaulation.  (Tr. 388-91.)  Thompson reported that he discontinued methadone treatment and had

not used marijuana, cocaine, or heroin for eleven days.  (Tr. 388.)  He further reported that, after

his back injury, he had started abusing pain medications and had a history of forging

prescriptions.  *Id*.  Dr. Hashimi diagnosed Thompson with polysubstance dependence, mood

disorder not otherwise specified, and rule out substance induced mood disorder.  (Tr. 390.)  He

ascribed Thompson a Global Assessment of Functioning ("GAF") score of 55.[2]  *Id*.

On October 31, 2005, Thompson reported to the Toledo Hospital ER seeking pain

medication despite having gone through heroin detoxification thirty (30) days earlier.  (Tr. 418.)

Thompson denied that he was suicidal at the time.  (Tr. 418.)

On November 3, 2005, Dr. Hashimi noted that Thompson was experiencing anxiety, his

affect was "bright," and he denied suicidal or homicidal ideation.  (Tr. 547.)  Thompson reported

that he had been sober for thirty-four (34) days. *Id*.

On January 5, 2006, Thompson went to the Toledo Hospital for detoxification from

heroin and marijuana.  (Tr. 487-89.)  He also complained of depression and expressed feelings of

wanting to hurt himself and others.  *Id*.

From January 6 to 9, 2006, Thompson was hospitalized at Flower Hospital for suicidal

ideation and drug detoxification.  (Tr. 473-86.)

In April 2006, the psychiatric nurse Deborah Morgal, M.S.N., and psychiatrist P.

Torsekar, M.D., completed a Mental Functional Capacity Assessment for the Ohio Department of

---

[2]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in
social, occupational, or school functioning.  A person who scores in this range may have a flat
affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See
Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association,
4th ed. revised, 2000).

Job and Family Services.  (Tr. 668-69.)  They indicated that Thompson's substance abuse was in

remission; however, Thompson continued to have problems with sleep, irritability, and anger.

(Tr. 669.)  Thompson was noted as suffering from multiple social problems and decreased coping

skills.  *Id.*  Specifically, Thompson was found to have:

> A markedly limited ability to:
> * Understand, remember, and carry out detailed instructions;
> * Maintain concentration for extended periods;
> * Perform activities within a schedule and maintain regular, punctual attendance;
> * Complete a normal workday or week without interruptions from psychological based symptoms;
> * Perform at a constant pace without an unreasonable number and length of rest periods;
> * Accept instructions and criticism from supervisors;
> * Get along with and not distract peers; and
> * Set realistic goals and make plans independent of others.
>
> A moderately limited ability to:
> * Remember locations and work-like procedures;
> * Carry out very short and simple instructions;
> * Work in coordination with or in proximity to others without being distracted by them; and
> * Make simple work-related decisions, interact appropriately with the general public, respond appropriately to changes in work setting, and be aware of normal hazards.
>
> No significant limitations in ability to:
> * Understand and remember short and simple instructions;
> * Ask simple questions or request assistance; and
> * Maintain socially appropriate behavior.

(Tr. 668.)

On May 9, June 13, and July 7 of 2006, Nurse Morgal noted at each visit that Thompson

had good hygiene, appropriate and spontaneous affect, clear and coherent speech, some insight

and fair judgment, and organized and goal-oriented thoughts.  (Tr. 546, 545, 544.)  She noted in

May that Thompson was attending AA/NA meetings, but things were not going well at home.

11

(Tr. 546.)  In both June and July, he reported that things were going better.  (Tr. 544-45.)  However, on August 8, 2006, Thompson reported that he was not doing well and had stopped attending AA/NA meetings.  (Tr. 543.)

From January 6 to 8, 2007, Thompson was treated at Flower Hospital for suicidal ideation. (Tr. 591-92.)  Thompson returned three days later and denied suicidal ideation after his pain medication was reinstated.  (Tr. 557-58.)  Thompson became angry and upset because he wanted more pain medication than the psychiatrist was willing to prescribe without a pain management consultation.  *Id.*

On February 12, 2007, Thompson was again hospitalized at St. Charles after he attempted suicide and continued expressing suicidal feelings.  (Tr. 685-97.)  Thompson reported that he had been using heroin, cocaine and marijuana for the past several weeks/months and that he was depressed, despondent, overwhelmed by chronic pain and thoughts of suicide.  (Tr. 687.)  During his stay, he responded well to mood stabilizing medications and therapy, and it was noted at discharge on February 16, 2007, that his mood had significantly improved.  (Tr. 658.)

On February 27, 2007, Thompson was admitted to Fresh Start House for a three-month drug treatment program.  (Tr. 512-28.)

After treatment at Fresh Start House, Thompson was discharged to Harbor Behavioral Health for follow-up care.  (Tr. 729-39, 844-48.)  He was seen June through September, and November of 2007.  *Id.*  At his visits, he denied suicidal ideation, his affect was congruent and flat, and his memory, attention, and concentration were noted to be intact.  (Tr. 736.)  He received various medications throughout this time.  (Tr. 729-39, 844-48.)

On October 4, 2007, Thompson was admitted to St. Charles Mercy Hospital after

reporting that he had been feeling very depressed, despondent, overwhelmed, and suicidal.  (Tr. 817.)  He demonstrated superficial judgment and poor insight.  *Id.*  He stated that he was under a lot of stress due to back pain after he helped a friend move two weeks earlier.  (Tr. 819.)  He was started on mood stabilizers and antidepressants, and was involved in therapy.  (Tr. 817.)  He responded to treatment and was discharged four days later.  *Id.*

On January 10, 2008, the ALJ ordered Thompson to undergo a consultative psychological examination at Larry E. Hamme, Ph.D. & Associates.  (Tr. 872-79.)[3]  Thompson displayed an affect appropriate to a depressed mood, reported he had lost interest in things he used to enjoy, and was experiencing feelings of hopelessness and helplessness.  (Tr. 874.)  He also reported problems with concentration and memory, difficulty sleeping, and weekly crying spells due to nightmares. *Id.*  Dr. Avery administered tests that showed Thompson appeared to be functioning in a borderline intellectual range.  (Tr. 875.)  Dr. Avery diagnosed Thompson with major depressive disorder, recurrent, moderate; pain disorder associated with both psychological factors and a general medical condition, chronic; bipolar I disorder, most recent episode depressed, moderate; and, personality disorder not otherwise specified.  (Tr. 876.)

Dr. Avery opined that Thompson had:

Moderate impairment in his ability to:
•     Relate to others;
•     Understand, remember, and carry out complex instructions;
•     Withstand the stress and pressures associated with day-to-day work activities.
•     Make judgments on complex work-related decisions;
•     Interact appropriately with the public, supervisors, and co-workers; and
•     Respond appropriately to usual work situations and to changes in a routine work

---

[3]  The ALJ and Plaintiff's Brief attribute this assessment to Dr. Hamme.  (Tr. 26.)  However, the assessment was actually performed by Roger H. Avery, a psychologist at Larry E. Hamme, Ph.D. & Associates.  (Tr. 872-79.)

setting.

Mild limitations in his ability to:
- • Understand and remember simple instructions;
- • Carry out simple instructions; and
- • Make judgments on simple work-related decisions.

(Tr. 876-78.)

Dr. Avery felt that Thompson had the mental ability to perform at least simple, repetitive work tasks.  (Tr. 876.)

***Hearing Testimony***

At the hearing on September 21, 2007, Thompson testified to the following:

- • He lives with his sister, who does all of the housework and the grocery shopping. (Tr. 891, 895.)

- • He experiences constant and extreme pain in his lower back and right leg.  He can stand for ten to fifteen minutes and walk half a block.  He uses a cane to walk, which was prescribed by Dr. Blood.  He can also sit for fifteen to twenty minutes at a time.  (Tr. 891-92.)

- • He suffers from depression and post-traumatic stress disorder.  He has been hospitalized several times over the last year for mental issues.  He has tried to commit suicide several times.  He is depressed because he cannot work and has lost "everything" – including his marriage and home.  He is currently taking medications for these conditions.  (Tr. 891, 893-94.)

- • It is hard for him to concentrate, he does not learn very well, and he is very impatient.  He has attempted to work easy jobs, but had a difficult time.  (Tr. 891.)

- • His day is "pretty much filled with pain."  (Tr. 894.)  He is constantly switching positions and laying down in an attempt to get comfortable.  *Id.*  He does not go out to visit people, and does not drive due to his medications.  (Tr. 895.)

- • Insurance pays for his medications.  (Tr. 896.)

- • He had a history of drug abuse, including heroin, cocaine, and marijuana, but has not used drugs since January 2007.  He attends Narcotics Anonymous meetings. (Tr. 897.)

14

### III.  Standard for Disability

A claimant may also be entitled to receive SSI benefits when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ found Thompson established medically determinable, severe impairments, due to degenerative disc disease, depression/anxiety, borderline intellectual functioning, and bipolar disorder/mood disorder; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thompson was determined to

15

have a Residual Functional Capacity ("RFC") for full range of unskilled, sedentary work.  The ALJ then used the Medical Vocational Guidelines ("the grid") to determine that Thompson is not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing*

16

*Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI.  Analysis

Thompson claims the ALJ erred by: (1) failing to follow the treating physician's rule; and (2) failing to support his RFC finding with substantial evidence.

**Treating Physician**

In his first assignment of error, Thompson claims that the ALJ, on the one hand, accepted the opinion of Dr. Blood, a treating physician, but, on the other hand, rejected portions of Dr. Blood's opinion without explanation.  (Doc. No. 14 at 10.)  Specifically, Thompson claims that the ALJ failed to provide good reasons for rejecting the marked limitation on reaching found by Dr. Blood.  By contrast, the Commissioner asserts that Dr. Blood, having seen Thompson only once at the time he rendered the opinion in question, was not a "treating physician."  (Doc. No. 17 at 11-13.)  As such, the Commissioner argues, the ALJ's failure to explain why he did not incorporate a marked reaching limitation was not reversible error.  *Id*.

Under Social Security regulations, the opinion of a treating physician is entitled to

17

controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting*

---

[4]  Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

SSR 96-2p).  Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984).  According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855;  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

> Under the regulations, a "treating source" is defined as follows:
>
> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).  We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (*e.g.*, twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).  We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. § 416.902.  The Sixth Circuit explained in *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873,

876 (6ᵗʰ Cir. 2007) that a physician will qualify as a treating source if the physician sees the claimant "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition."

Thompson argues that the ALJ erred by rejecting Dr. Blood's opinion that he had a marked limitation on non-exertional reaching – a limitation contained in an opinion dated April 26, 2010. (Doc. No. 14 at 11.)  At that point, Dr. Blood had only seen Thompson once before, on April 20, 2006 (Tr. 661, 667), and thus had not entered into the treating physician relationship as of yet.  *See Smith v. Comm'r Of Soc. Sec.*, 482 F.3d 873, (6ᵗʰ Cir. 2007) (finding no treating physician relationship had been established when the physician only evaluated the claimant once.); *Fleischer v. Astrue*, 2011 U.S. Dist. LEXIS 20068 (N.D. Ohio Mar. 1, 2011) ("[C]ourts have consistently held that one, or even two or three, examinations will not suffice to establish an ongoing treatment relationship.")  Furthermore, in *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 n.10 (6ᵗʰ Cir. 2006), the Sixth Circuit declined to find a treating physician relationship, noting that subsequent visits to a physician *after* the RFC assessment had been made "could not retroactively render [the doctor] a treating physician at the time of the assessment."

In his Reply, Thompson admitted that he had only seen Dr. Blood once when the opinion was rendered, but argued that he had sought Dr. Blood out for medical treatment, which qualified him as a treating physician.  (Doc. No. 18 at 1.)  Seeking a doctor for medical treatment does not automatically establish a treating physician relationship.  The patient must establish an "ongoing medical treatment relationship" with the doctor "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *See* C.F.R. § 404.1502.

20

Therefore, Thompson's argument that the ALJ did not afford the proper weight to Dr. Blood's opinion in reliance is misplaced. As Dr. Blood is not a treating physician, the ALJ was not bound by treating physician rule when evaluating those portions of Dr. Blood's opinion that were given after only one visit. *See Smith*, 482 F.3d at 876 (the reasons-giving requirement in § 404.1527(d) applies only to treating sources.) Thompson also avers that the Commissioner's argument – that Dr. Blood's opinion did not constitute a treating physician's opinion – is "new rationale" that the Court cannot consider. (ECF No. 18 at 1-2.) The Court disagrees. The ALJ's opinion did not affirmatively find that Dr. Blood's opinion of April 2006, constituted the opinion of a treating physician simply because the ALJ acknowledged that Thompson's treating relationship ended with Dr. Blood due to drug-seeking behavior. As such, the Commissioner's argument is not inconsistent with the ALJ's opinion.

Thompson's first assignment of error is not well-taken.

**Residual Functional Capacity ("RFC")**

In his second assignment of error, Thompson argues that the RFC finding was not supported by substantial evidence or the opinions on which the ALJ relied. Given the finding that Thompson suffered from severe mental impairments, Thompson asserts that the ALJ should have included restrictions in the RFC that accommodated these impairments. (Doc. No. 14 at 13-14.) Though the ALJ limited Thompson to unskilled work, Thompson contends that such a limitation is insufficient to accommodate his moderate impairments. *Id*. Conversely, the Commissioner argues that a limitation to unskilled work can account for moderate mental limitations, and the ALJ did not err by failing to include every limitation found by all examiners. (Doc. No. 17 at 16, 18.)

21

RFC is an indication of an individual's work related abilities despite their limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.945(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence.  *See* 20 C.F.R. § 416.945(a).  When determining a claimant's RFC, the ALJ is "required to consider the combined effect of all of the claimant's impairments."  *Scott v. Astrue*, 2011 U.S. Dist. LEXIS 17023 (N.D. Ohio Feb. 22, 2011) (*citing Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1071 (6th Cir. 1992); *Cooper v. Comm'r of Soc. Sec.*, 217 Fed. App'x 450, 452 (6th Cir. 2007)).

To the extent that Thompson is arguing that the ALJ erred because he included only relatively minor limitations in the RFC to accommodate Thompson's "severe" mental impairments, such argument is not well taken.  In the Sixth Circuit, a claimant's impairments are categorized as "severe" if there is merely a *de minimis* impact on his or her ability to perform basic work activities.[5]  *See Halcomb v. Bowen*, No. 86-5493, 1987 WL 36064, at *3 (6th Cir. May 27, 1987); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985); *Salmi v. Secretary of Health and Human Servs.*, 774 F.2d 685, 691-92 (6th Cir. 1985); Social Security Ruling 96-3P: *Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe*, 1996 WL 374181, at *1.  Thompson has not cited any law suggesting that the ALJ's finding that an impairment is "severe" at Step Two automatically necessitates major restrictions when

---

[5]  The regulations describe a severe impairment in the negative:  "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a).

determining the claimant's RFC at Step Four.  Given the very broad definition of what constitutes a severe impairment at Step Two, it is not *per se* inconsistent for a severe impairment to result in relatively minor work restrictions.

Thompson next argues that the RFC finding is internally inconsistent and unsupported by substantial evidence, because the ALJ failed to include restrictions to accommodate his "moderate" mental limitations.[6]  (Doc. No. 14 at 14.)  An ALJ "must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work." S.S.R. No. 85-15, 1985 SSR LEXIS 20 (1985).  In *Collins v. Comm'r of Soc. Sec.*, 357 Fed. App'x 663, 671 (6th Cir. 2009), the Sixth Circuit found no error where the ALJ relied on the Grids after finding that the claimant had the ability to perform the full range of unskilled work, despite the presence of moderate limitations in his ability to follow detailed instructions. Nonetheless, the ALJ gave no indication that he considered Thompson's moderate difficulties with social functioning, concentration, persistence, and pace.  Clearly, significant limitations in a claimant's mental work capabilities must be accurately accounted for if an RFC finding is to be supported by the record as a whole.  *Scott*, 2011 U.S. Dist. LEXIS 17023 at *17 (finding that serious pacing and concentration limitations "need to be accurately taken into account if the functional capacity is to have any meaning")

The Commissioner, relying on *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), argues that there is no bright line rule that unskilled work can never adequately account for moderate mental limitations as a matter of law.  The Court disagrees with the Commissioner's

---

[6]  At Step Three of the sequential evaluation, the ALJ found that Thompson had moderate difficulties in social functioning and moderate difficulties with concentration, persistence or pace.  (Tr. 20.)

23

interpretation of *Smith*, wherein the ALJ omitted his previous finding – that the claimant "often" suffers from deficiencies in concentration, persistence, or pace – from the hypothetical question posed to the vocational expert. *Id*. Therein, the Sixth Circuit found no error despite such omission because the ALJ included other restrictions in the hypothetical that essentially accommodated the claimant's limitations – restrictions against quotas, complexity, stress, etc. *Id*. Thus, *Smith* is distinguishable.

The case at bar is more akin to the Sixth Circuit's decision in *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010). In *Ealy*, the ALJ concluded that the claimant had moderate difficulties with regard to concentration, persistence or pace, but failed to provide the vocational expert ("VE") with a fair summary of those conclusions. *Id*. at 516. Instead, the ALJ merely limited the claimant to simple, repetitive tasks and instructions.[7] *Id*. The definition of unskilled work, "work which needs little or no judgment to do simple duties ..." is by and large the same as the ALJ's deficient limitation in *Ealy*. Therefore, the ALJ erred by failing to consider the combined effect of all of the claimant's impairments when he omitted the moderate mental limitations from which Thompson suffered. *See also, Frederick v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 42904 (E.D. Mich. 2011) ("The failure to account for concentrational deficiencies constitutes reversible error."); *Herriman v. Apfel*, 2000 U.S. Dist. LEXIS 2177 ( E.D. Mich. 2000) (remanding case where ALJ's hypothetical failed to account for claimant's

---

[7] In the case before this Court, the ALJ did not call a VE, because he did not find that there were any non-exertional limitations. However, had the RFC accurately accounted for Thompson's mental impairments, the ALJ would have been required to elicit the testimony of a VE. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008) ("We have held that the SSA may not rely on the grids alone to meet its step-five burden where the evidence shows that a claimant has nonexertional impairments that preclude the performance of a full range of work at a given level.")

concentration deficiencies).  In *Frederick*, the District Court for Eastern Michigan explained that "[t]he fact that a job is simple and unskilled has nothing to do with whether or to what degree a worker's moderate concentrational deficiencies will affect the timely completion of that job, and indeed, courts have found such descriptions insufficient to address deficiencies."  2011 U.S. Dist. LEXIS 42904 at *16 (*citing Newton v. Chater*, 92 F.3d 688, 695 (8th Cir.1996)); *cf. Ball v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 18701 (S.D. Ohio Feb. 25, 2011) (finding that the ALJ's restriction to "low stress" jobs did not clearly encompass the factors of concentration and persistence within the workplace setting).

In conclusion, because the ALJ gives no indication that he incorporated Thompson's moderate mental limitations into his RFC finding, the Court finds that the RFC is not supported by substantial evidence.  Thompson's second assignment of error is well-taken.

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

IT IS SO ORDERED.

<u>s/ Greg White</u>
U.S. Magistrate Judge

Date: August 2, 2011